Good morning, Your Honor. May it please the court, Paul Taylor on behalf of Clear Channel, with me at counsel table, Steve Minson. Are you going to be using all the time? I'd like to, yes, I will be and I'd like to reserve three minutes for rebuttal. All right, so your co-counsel will not be addressing the court? Correct. Okay. Thank you. For the reasons set forth in our briefs, we ask this court to reverse the summary judgment entered by the trial court, Judge Lasnik, and remand this case for trial. In my remarks this morning, I want to address first briefly the background, and then I want to address three points. First, I want to deal with the linchpin of the court's argument. That's Mr. Sandblast of Clear Channel, his October 20th, 2006 email. Second, I want to address the court's claim that this unsigned draft document that they rely on was in fact an integrated and binding contract. And third, I want to talk about whether the court's position and their argument makes sense, because as I'll point out, I don't believe it does. What is the background? Clear Channel had three billboards that were collectively worth over three million dollars. They were located on properties that the court was going to be acquiring for a construction project. The parties began negotiations to see if there was some way of resolving the situation short of a formal condemnation proceeding. One of the reasons Clear Channel does that is because it would rather find alternate locations to maintain signs as opposed to losing its sign forever, albeit getting the cash. That leads us then to the negotiations between the parties. Those negotiations culminated in a meeting on October 12th, 2006. In connection with that meeting, Mr. Sandblast, or following that meeting, Mr. Sandblast sent an email to the court. It's ER 117, and it's the linchpin of the court's case. Mr. Sandblast wrote, the attached documents reflect terms mutually accepted at our meeting on October 12th. Now, if you look at that in isolation, you say to yourself, that's a contract. But if you look at it in context and viewing the light, viewing the evidence in the light most favorable to Clear Channel, you come to just the opposite conclusion. Let me tell you why. At that meeting, at the October 12th meeting, Clear Channel had brought with it an earlier version of the ELTA, the Early Lease Termination Agreement. That earlier version, in the record at ER 98-103, that had both a money provision and a provision for new leases. At the meeting, then, the parties discussed and negotiated that issue. And what do we have in terms of the record of what happened at that meeting? First, the court's Mr. Walloner says, Clear Channel agreed to take $500,000 full stop, no relocation sites. Let me tell you what my problem areas are. And maybe you, you know, because I think we probably are all fairly familiar with the procedural part of it, but there's a couple areas that I have problems, and maybe you can integrate this since we don't have a lot of time. Washington law tells us to look at the objective manifestations of the agreement. What was written, not what was intended to be written. And how do we get around the language of the October 20th, 2006 revised, I don't know how, if you call it ELTA or ELTA or whatever, which your client drafted, which says $500,000 constitutes Clear Channel's, quote, full and complete compensation, despite any claims for relocation assistance and any other claims of any nature. What do we do, what do I do with that? Two, two responses. First, Your Honor, recall that it is Ms. Lippitt's testimony at ER 77 line 6-6 through 11 that the court specifically asked relocation language be removed from the agreement, but that it was agreed they would get three location sites. That's Ms. Boyd's testimony, and that creates the inference that there was that additional agreement. When I said that viewed in context, the October 20th email actually shows there is a dispute. You have to again recall, they asked that it be removed from the document, and if you compare the two documents, you'll see simply that a couple of paragraphs were taken out. Mr. Sandblast sends it back and says this reflects our agreement, and it did. It included $500,000, and per the court's request, the clause about relocation was not included. So that's consistent with the fact where we're entitled to the inference that there were two components to the contract claim. In terms of additional objective manifestations, you have to also look at the port. What did the port do with this document? And the answer is, after it was sent to the port, they referred to it as a draft agreement, and they said the port legal review had yet to take place of that agreement. Well, if you, if let's just say, I mean, I think the language is troubling, but then I, but then if, I think we also have to look to actions here, and whether those showed the existence of a contract, and you do have, you, nevertheless, it's not disputed that your client drafted the revised ELTA, but then sent the revised ELTA to the port saying it included the terms that the parties mutually accepted, and then in March of 2007 said the ELTA contained the party's understanding, and then never in three years told the port that the ELTA was contingent on relocating billboards. So what am I missing here? Well, as Ms. Voigt testified, there was no reason to because she believed, and the parties had discussed, that that was the agreement. There really, though, the construction project had been delayed and delayed and delayed, and there was no reason for the parties logically to be discussing the matter. There was simply, there was nothing going on. The signs were up. They were collecting revenue. Clear Channel was happy. But, Mr. Taylor, getting back to the ELTA, for me, it's difficult to square your position that there's some controversy, for instance, by the remark that, you know, Clear Channel wanted to take care of the relocation problems later, or somebody said take it out of the agreement. When the agreement says this, and this is the basis, I guess, to finally integrate that this is a complete agreement, and it waives all these other claims, including relocation claims. And no, and you never challenged that. Your Honor, let me address the interview. If I understand it, you're asking about the integration issue. Let me address that. Well, that's part of it, sure. But I mean, the fact that that clause says, you know, you're waiving all of the claims, including relocation claims, is inconsistent with what preceded that piece of paper, unsigned piece of paper, including the comment that, well, you know, we want to take care of relocation as a separate matter. You're assuming that it's a binding, or that it's an integrated and binding? No, I'm assuming that the circumstances, you know, give rise to a reasonable inference that that's what it is. They certainly gave rise to that inference. They equally give rise to the inference to which we're entitled under Rule 56. That as Ms. Voigt testified, the court asked us to take out from the document itself the language regarding relocation, but that relocation was part of the deal. So, yes, you can reach the inference. No, but how is that consistent with the language in the ELTA, that all other claims are waived? There is an issue there, Your Honor, if it were a integrated binding agreement. But that's where we get to the question of integration. All right, why don't you address that, that may help me. Under Emmerich, the state of Washington, an integrated document is one the parties intended as a final and complete expression of their agreement. Now, using this definition, we know, and entitled to the inference, that the parties did not intend this as a final and complete expression of their agreement because the court specifically asked that this language about relocation be removed from the agreement. Second, the court never treated it as an integrated or final and binding expression of their agreement. That's where we get to the notion that after getting it from Mr. Sandblast, the court didn't say, you're right. The court instead said, no, court legal review has yet to take place. That's an indication that they have not agreed that this is the final and binding expression of the party's agreement. Second, in March of 2007, the court wrote that the removal dates in the draft agreement would be subject to change. That's not a final and binding agreement when they're calling it a draft agreement that is subject to change. The courts, Mr. Wallander, in April of 2007, six months or five months after receiving the document, referred to it not as an agreement, but as a settlement proposal. Well, but the agreement was eventually signed by the court commissioner, right? A different agreement was eventually signed. That was a different agreement? Yes. What was different about it? There were two significant differences. The draft ELTA required payment of $500,000 by February 1st, 2007. Without telling Clear Channel, without discussing it, the version that the court ultimately signed eliminated the payment deadline requirement. Well, you know, Clear Channel is pretty sophisticated, and if it really thought that $500,000 with no relocation was a bad idea, why didn't it just send a letter to the court or say something in an email? The ELTA is great, but don't forget about relocation. We did just that in October of 2009 when this finally came to a head. Mr. Wallander of the court said, it's time to take your signs down. Ms. Voigt said, we don't have our relocation sites yet. Mr. Wallander said, we've got an agreement. Ms. Voigt said, no, we don't. Mr. Wallander said, you're right. Well, that was 2006 when you sent the draft of the ELTA. You know, it was 2006 when everyone, all of this happened. So in 2009, someone looked at it and said, what the heck are you guys doing? You should have gotten more money. But that's different than whether or what the, you know, three years had gone by. Certainly, and the scenario you're portraying is one inference. Under Rule 56, though, we're entitled to have all the inferences drawn in our favor. But going to Judge Tashima's question again, there was a deadline for payment of February 1st, 2007. I thought that was waived by a clear channel for tax reasons. No, Mr. Wallander testified that that was the case. He said, I talked with Terry Sandblast and he asked that the payment be deferred for tax reasons. Mr. Sandblast testified, no, we did not have that conversation. We're entitled to the inference that that conversation did not occur. The next change in the draft, or in the ELTA made by the, in the version the court signed, was it states this agreement is made. You can use your time, but you've gone below three minutes. I don't, you may not have much rebuttal. That's up to you. The last change they made was the final version says this agreement was made in 2009. The draft ELTA refers to an agreement made in 2006. Thank you. Okay. Good morning. Good morning, Your Honor. May it please the court, Judge Hugg, my name's Michael King. I'm from the Carney-Badley Spellman firm here in Seattle, along with Steve Nurse, who's listening at council table, and Jason Kettrick, who's with me on the brief. We're here on behalf of Clear Channel. So are you going to be making the argument, though? I will be making the entire argument. All right. I was planning to organize my argument this way. I was going to focus principally on the contract issue and secondarily on Estoppo. And I was going to divide the argument and contract by focusing on two things. One, I wanted to clarify, because I thought there might be some potential confusion. I wanted to clarify exactly what Clear Channel's theory of the case was in front of the district court, because that ought to be the theory of the case we should be focusing on today. And then I was going to apply the law in Washington that is relevant to that specific theory, but I don't have to do that anymore. Because Clear Channel has forthrightly acknowledged that their theory of the case today is the final theory that they presented to the district court on the motion for partial reconsideration. The materials that we provided you include behind tab four, an extract from Clear Channel's motion for partial reconsideration. And on pages eight and nine of that motion, they made the point of talking about objective manifestations, and they took issue with Judge Lasnik's evaluation of the record, and they said that, Judge Lasnik, you've overlooked the critical objective manifestation. It's the testimony of Ms. Lippens when she described what happened on the October 12, 2006 meeting, what happened at that meeting. And they say that she said that a full meeting of the minds happened, not a partial meeting of the minds, a full meeting of the minds on two things. One was the written agreement. Now, that's the document you were discussing with counsel, and we provided you with a copy of that email from October 20th with the attached writing, which was prepared by Clear Channel's lawyers. And Ms. Lippens says, yes, we agreed to that, but we also agreed to this oral side deal. And under the oral side deal, it was agreed that there would be relocation of our billboards to three sites. Now, Judge Callahan, you said, let's look at the objective manifestations. How do we get around this language that's in the ELTA, which talks about, and Justice Schema, you touched on this too, full and complete compensation. You know, they're not denying that the written agreement they drafted, which memorialized the understanding we reached on October 12th, contradicts this oral side deal. They're simply now telling you that, well, there was the written agreement, but there was also the oral side deal. And the oral side deal, basically, they're saying it trumps the written agreement. Yes, the written agreement says what it says, but the oral side deal says, nonetheless, we get relocation, we get our three billboards moved to three sites on Port Property, and that was the total agreement that was reached, part written, part oral. I think this enormously simplifies the discussion today. Because how do you, I guess on that, and I didn't ask them that, but they seem to be, if you look at Hearst Communications, that isn't anything Clare Channel might have said at the October 12th, 2006 meeting, or Clare Channel's notion of a good deal, irrelevant to whether the contract existed. Is Hearst a problem for the Clare Channel? Hearst is a terrible problem for Clare Channel. Let me go directly to the state of the Washington law. Because starting with this basic, fundamental, established fact, it's acknowledged now, they're not denying that the written agreement that was reached, and drafted up, and transmitted, here's the form, this is the agreement we reached. And we agree with that, that was the agreement that was reached. They don't deny that that agreement with its sweeping clause about, this is what you get, $500,000, covers everything, contradicts this supposed oral side deal. That's the way Judge Lasney put it in his motion for reconsideration, denial order. He said, well, and this is on page three, and provided you with that behind tab five. He said, really, we're not talking here about a failure to agree. We're talking about a suggestion that there was an oral side deal. And he says that oral side deal contradicts the writing. And that's their problem. Because under Washington law, and Hearst makes this clear, if there was any doubt about it after Berg versus Huddisman in 1990, which is a case that's discussed in the briefs. And I'll tell you quite frankly, when that came down, it sort of put the fear of God into the commercial bar in the state. Because we all thought, oh my heavens, what's happened to written contracts in Washington? And the Washington Supreme Court spent a few years in a series of decisions trying to say, no, no, no, that's not what we're saying. All we said in Berg was that we were overruling a line of cases under which a trial judge was told, you have to stay within the four corners of the document. You have to figure out just within the four corners whether there's an ambiguity. You can't even look at the extrinsic evidence. Put it out of your mind. And only if you find an ambiguity that way do you then get to look at the extrinsic evidence. The Washington Supreme Court said, we're going to modify our extrinsic evidence law to that extent, but only to that extent. And the Washington Supreme Court in the Hearst case makes this very clear. If you look at the reported version of the decision, 115 Pacific 3rd, pages 266 and 267, the court says, unfortunately, there's been much confusion over the implications of Berg. And then they talk about the decision in Hollis versus Garwell, which had come down a few years before. And they end up summarizing by saying, since Berg, we have explained that surrounding circumstances and other extrinsic evidence are to be used. And they quote from the Hollis case. And I suggest you might want to look at that one, too. To determine the meaning of specific words and terms used and not to show an intention independent of the instrument or to, and here's the three-word phrase that appears over and over in Washington law, vary, contradict, or modify the written word. So, you see, the problem with all those cases is they're all talking about a written contract signed by the parties. This is not one of them. This piece of paper is not a contract. It's only evidence of an oral contract. So, I'm not sure those rules apply. They do apply for this reason, Your Honor, because in Washington, the fact that the signature hasn't actually been attached, the John or Jane Hancock, that's not material. Well, it's not only that, you know. I mean, you know, the Port Commissioner hasn't even signed it. Quite true, but the Port was bound to sign it. You know, if this had gone the other way, if the Port. What I'm saying is that that, you know, you're talking about something that's not a written contract. No, I don't agree, Your Honor. Under Washington law, the fact that you have a writing and it hasn't actually been signed, and it may not have been signed by either of the parties, and we've cited these cases in our briefing, Matthews and others. Under Washington law, the fact that the signatures haven't yet been appended does not mean that you do not have a written contract. We have a written contract. Well, no, no, that's what we're trying to determine, you see. We're trying to determine is that all there was to it? In other words, was there a meeting of the minds that these were the terms, and it's an integrated contract, or was a part of the deal that, no, we have the statute. Remember now, you have to find this new location. It's not an integrated agreement question. In the Washington cases since Berg have made clear, it's not an integrated agreement question. They admit, Ms. Lippins admits, that there was a deal. Their claim, and now they have forthrightly acknowledged, this is what they're telling this Court, and this is what they told the District Court of Reconsideration, they're saying that there was an agreement that was partly in writing and partly oral. It doesn't matter whether or not you say it was, the result here doesn't turn on whether you conclude it was a fully integrated written agreement as opposed to a partially integrated written agreement. There may have been some uncertainty about that under Washington law in the immediate wake of Berg, but the cases since Berg have clarified. See, they're saying they're not disputing that it's a written agreement. They are not disputing there is a written agreement. They're disputing that there was a written part. They're saying there was a written part and an oral part. The problem is the oral contradicts the written. Now, they create what they describe as an issue of fact about how we have this extrinsic evidence which shows there's an issue of fact about whether, in fact, the parties on October 12, 2006, entered into an agreement that was partly oral and partly written. And to be blunt, my answer is I don't care. And this court shouldn't care because the Washington Supreme Court has made clear we don't care if the part oral contradicts the part in writing. The oral's out. The evidence is incompetent. You don't consider it. You cannot contradict the terms of a written agreement. It doesn't matter if the party is saying, well, it was partly oral and partly written. That was Amherst. Well, now, if we agree with you on that, then we don't need to get to the promissory or equitable estoppel. That's correct, you don't. But if we don't agree with you, we do need to reach that issue. That's correct. And let me briefly address the equitable estoppel point, if I might. I'm not sure the district court was right on promissory estoppel. I know that the court claimed equitable, but then there's, so if I would like to hear what you have to say. Absolutely. I think the label is wrong, but I think the rationale on the estoppel side is correct. I don't think it's promissory estoppel, because with promissory estoppel there, we're dealing with, I think it's section 90 of restatement first originally, and it's the whole notion there was a lack of consideration. But equity steps in anyway. We're dealing with equitable estoppel, but we're still dealing with equity. And here's the critical thing to recognize. When counsel stands back up and says, oh, but there was an issue, a fact, about whether an agreement was reached, that's irrelevant on the equity side. Equity exists to do justice where the law, capital L, law side would screw things up. So when we're talking about the equitable estoppel issue, we are assuming, of course, that they win, that there's an issue, a fact, about whether an agreement was reached. Their problem is that there's still the representation embodied in the email. The email we submit on the law side is the transmittal of the agreed written agreement. But on the equity side, we're saying that that transmittal is also a representation. It is an act, a statement. That's the first element of equitable estoppel. Then the second question becomes whether the port was entitled to reasonably rely. That's Mr. Sandblast's testimony. I put that behind tab six. He's the experienced fellow for Clear Channel. He knows darn well that Hardy's in the position of the port who are in the process of doing a major construction project. Yes, Your Honor. Doesn't reliance have to be detrimental reliance? Yes. And there was detrimental reliance. What's the detriment? The detriment is that the port was essentially persuaded by this representation not to go ahead and do an eminent domain proceeding. They could still go ahead with it. Ah. But here's the problem. They lost the opportunity to just get this over and done with. And then they were confronted. Well, what's the detriment from that? The detriment is that Clear Channel tried to take advantage of that situation and go to court on the equitable side and get a preliminary injunction which would have. All it means is they have to pay just compensation. How can that be detrimental? Your Honor, the point is that we detrimentally relied by giving up a right. Now, the fact we ultimately won in court. Well, what's the right? The right is to proceed in eminent domain and to condemn. You didn't give it up. It just got deferred. No, no, no. Here's the significance. The significance is as a matter of public policy. Equity does not want to allow parties in the position of Clear Channel to sit there and know, one, they've made a representation. Two, there's reasonable reliance. Three, as a result of that representation. But part of that law, there has to be detrimental reliance. Exactly. And but the question is. It's detrimental. The question is the timing of the detriment, Your Honor.  How do you time a detriment? The detriment is that we lost the opportunity to simply clear the decks. We lost the opportunity to. I mean, how is that detrimental? It is detrimental because it created the possibility. You can clear the deck later. If we hadn't won. Not the same way. Your Honor, the fact that we won and we beat back the preliminary injunction application and they abandoned the claim for equitable relief, that just proves that we managed to dodge the bullet. But they loaded the gun. They loaded the gun by making this representation. They loaded it with a gun. That's true. They did. But as a matter of policy, I would submit the chancellor in equity would look at this circumstance and say, here is a sophisticated party. They transmitted this email, which was unambiguous, which said, here is the deal. It memorializes the terms we agreed to. We relied on it. They watched us rely on it. They know we're now going to go ahead and cut a deal with the underlying property owners. Chancellor would say, but, you know, in all honesty, I see no detriment. But anyway, I understand your argument. You only have a minute and a half left, though. All right. I have one other question. Yes, Your Honor. When is the last point in which you discussed relocation with Clear Channel? And can you show me in the record where that happened? The last point that relocation was discussed is a matter of, could we do a deal on relocation? The last point it was discussed we submit was the, well, we submit, it's the email in June of 2006 when we said relocation is off the table. And then they responded with the alternative, well, how about extending the terms of our other leases? And I am not denying that the concept of relocation was batted around in some fashion on October 12, 2006. It is our position that we walked out of the meeting on October 12, 2006 and knew that relocation was a dead letter. It is their position that there was an oral agreement reached that there would be relocation, too. It is our position that as a matter of Washington contract law, now you know that they admit, Judge Tashima, they admit that that ELTA document was a deal that was reached. They were going to put their John Hancock on it or their Jane Hancock on it just as soon as the court did, but they knew there was a deal, there was an enforceable deal. Once that happens and they claim, but we were going to modify, we were going to alter, we were going to contradict that with the trump card of the oral deal. We are dealing with clear Washington law. You cannot contradict the written agreement. The extrinsic evidence is out. The only thing that's here is the ELTA and the district court properly enforced it. All right, your time is up. Thank you for your argument. I like Mr. King a lot, but I disagree with him even more about what Washington law is. Berg, Seattle Times, Hearst, all of those cases dealt with a signed written agreement. None of the cases the court cites deal with oral agreements. In fact... Well, what about his point that you could have a written agreement that's unsigned? You can, and under the Crown Plaza case, the fact that, cited in our brief, Washington Court of Appeals, the fact that the written agreement is unsigned creates, for purposes of Rule 56, an inference that that was not the agreement. It becomes a jury. The fact that the document is not signed creates a jury question when viewed along with the oral testimony about what the agreement really was. In this case, it was voice testimony. So, wait, am I understanding you to say that every unsigned written agreement cannot be decided on summary judgment? If there is evidence, extrinsic evidence... No, that's not what I asked you. I heard you say that every unsigned written agreement under Washington law would have to go to a jury. It cannot, summary judgment cannot be granted in that situation. That's what I said, I misspoke. Crown Plaza deals with a situation where the party who was trying to avoid enforcement of the unsigned document presented extrinsic evidence of additional terms beyond the written agreement. The court said that creates a question of fact. I agree, if you had, in isolation, with no other testimony about what was agreed to or not agreed to, you simply had the document, then I don't know that you could get to a question of fact. Well, I understood, Mr. King, to distill your argument on motion for reconsideration that you acknowledged that there was a written agreement, but then there was another oral agreement that was modifying the written agreement. I disagree with that characterization. I would say we had an oral agreement which was partially expressed in the writing. Under that circumstance, then you get to actually comment B to section 217 of the Restatement of Contracts. And there the restatement explains that if the parties orally agree that performance is subject to a condition, providing relocation sites, then either it's not an integrated document or it's only a partially integrated document until the condition occurs. My time is up. Unless the court has further questions, thank you. Thank you. Thank you. Judge Huck, did you have any additional questions? No, no questions. All right, thank you. This matter will stand submitted, then.
judges: Hug, Tashima, Callahan